Robert SKALING et al.

v.

**AETNA INSURANCE COMPANY and Travelers/Aetna Insurance Company as successor to Aetna Insurance Company.**

No. 2000–325–Appeal.

Supreme Court of Rhode Island.

May 8, 2002.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Nicholas Gorham/Dianne L. Izzo, North Kingstown, for Plaintiff.

Thomas R. Bender, Providence, for Defendant.

Kelly M. Fracassa, Providence, amicus from the Rhode Island Trial Lawyers Assoc.

Present: LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

On August 26, 1996, the plaintiff, Robert Skaling (plaintiff or Skaling), filed a four-count complaint in Superior Court against the defendant, Aetna Insurance Company (defendant or Aetna), alleging a breach-of-contract by Aetna for its refusal to pay underinsured motorist insurance benefits and insurer bad faith in the investigation and handling of Skaling's claim.[1] The count alleging insurer bad faith was severed from the breach-of-contract claim. A jury found that Skaling's injuries were proximately caused by the negligence of the underinsured tortfeasor, awarded Skaling total damages of $1,305,000 and proceeded to reduce the award by 10 percent, to $1,174,500, based on its conclusion that Skaling's own negligence was a contributing cause of his injuries. Judgment was entered for Skaling for $300,000, the total amount of the policy limits. In *Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 292 (R.I.1999) (*Skaling I*), this Court affirmed the decision of the trial court based upon our conclusion that Aetna had breached its contract with Skaling. However, we concluded that Aetna was responsible for prejudgment interest on the amount of the judgment, $300,000, notwithstanding that this award exceeded the limits of the policy. *Id.*

Following our decision in *Skaling I*, Aetna moved for summary judgment on the remaining count alleging insurer bad faith and Skaling moved to amend his complaint to add two additional claims. The Superior Court hearing justice denied Skaling's motion to amend the complaint and granted defendant's motion for summary judgment. The plaintiff has appealed. We

---

1. Skaling also sought a declaration that he was the beneficiary of $600,000 worth of insurance under a stacking theory and a count for attorney's fees pursuant to G.L.1956 § 9-1-45. These counts are not relevant to this appeal.

vacate the summary judgment and remand this case to the Superior Court for proceedings in accordance with this opinion.

## Facts and Travel

The facts leading up to this controversy are set forth in detail in *Skaling I* and we need not recount them in detail. On October 20, 1995, Skaling was severely and permanently injured when he fell from a railroad trestle outside his Coventry home while attempting to rescue Matty Webber (Webber), a passenger in a Jeep automobile operated by Shaun Menard (Menard), an underinsured tortfeasor. According to the trial testimony, Skaling fell from the trestle while he was attempting to pass the Jeep, as he was "edging along * * * with [his] belly up to the vehicle as close as you can possibly get to something." *Skaling I*, 742 A.2d at 286. As he reached the driver's door, he fell from the trestle, suffering severe and permanent injuries that required two months of hospitalization and medical expenses in excess of $50,000. *Id.* at 287. Menard's automobile liability insurer subsequently settled Skaling's claim and paid plaintiff $25,000, the limit of Menard's policy. The plaintiff's claim, seeking underinsured insurance benefits from Aetna, was denied based on Aetna's determination that Skaling's injuries did not arise from the ownership, maintenance or use of the Menard vehicle.

In its motion for summary judgment after this Court's decision in *Skaling I*, defendant argued that Skaling's claim against the underinsured tortfeasor was a fairly debatable claim, thereby relieving Aetna of any liability for insurer bad faith. Significantly, Aetna argued that the finding of 10 percent comparative negligence, as well as Skaling's failure to demonstrate

that he was entitled to a directed verdict on the contract claim, conclusively established that Skaling's claim was fairly debatable and that therefore Aetna was entitled to summary judgment on the bad faith count. The plaintiff simultaneously moved to amend his complaint to add two additional counts against Aetna.

Skaling sought production of Aetna's claim file and sought to depose two claims adjusters who had been assigned to the case before the date Skaling filed suit. Aetna moved for a protective order and argued that Skaling's failure to obtain a directed verdict in the breach-of-contract action was fatal to his bad faith claim; thus, additional discovery would serve no further purpose. Aetna successfully persuaded the hearing justice that events occurring after Skaling filed suit against Aetna and any materials developed in defense of that action, were not relevant to Aetna's conduct at the time the claim was denied. The hearing justice limited Aetna's production of documents to the date of Skaling's suit. He further directed Aetna to prepare a privilege log and to produce post-suit materials for in-camera review. In a subsequent chambers conference, the hearing justice found, *sua sponte*, that the documents were within the attorney-client privilege, notwithstanding that Aetna had not asserted the privilege.[2] Ultimately, the hearing justice declined to order the production of any post-suit materials acquired by Aetna with the exception of a statement by Menard taken by his own insurer. The record discloses, however, that Aetna presented evidence at the hearing on summary judgment that was ultimately relied upon by the hearing justice but was unknown to Aetna when it denied

---

**2.** Clearly, Aetna could not assert the attorney-client privilege and defend on the ground that it relied upon its attorney's advice when it denied Skaling's claim. Further, Aetna stated

in its pleadings that "notwithstanding any applicable privilege, any matters subsequent to August 26, 1996 when plaintiff's suit was filed * * * are not relevant to this litigation * * *."

Skaling's claim and acquired after Skaling filed suit. As discussed *infra*, we deem this to be error.

The hearing justice also denied Skaling's motion to amend the complaint by adding two additional counts: count 5, seeking damages for Aetna's breach of the implied covenant of fair dealing and good faith, and count 6, asserting that Aetna's refusal to pay his claim was "willful, wanton and without reasonable justification." The trial justice refused to allow the amendment, and agreed with Aetna's argument that neither count stated a cause of action or theory of recovery that differed from the bad faith claim pending in count 4.

On appeal, Skaling urges this Court to reverse the grant of summary judgment and declare, pursuant to G.L.1956 § 9–1–33, the statutory codification of the tort of insurer bad faith, that the issue of bad faith is a question of fact to be determined by the fact-finder. Skaling argues that, with respect to certain claims of insurer bad faith, the standard of proof adopted by this Court in *Bartlett v. John Hancock Mutual Life Insurance Co.*, 538 A.2d 997, 1001 (R.I.1988), is inappropriate and indeed, insurmountable. In *Bartlett*, we declared that an insured may not recover against an insurer for its bad faith refusal to pay or settle a claim unless the insured can establish that he or she was entitled to a directed verdict on the breach-of-contract claim. Also, we held in *Bartlett*, that the count alleging bad faith must be severed from the breach-of-contract claim. Further, plaintiff, in conjunction with the Rhode Island Trial Lawyers Association,[3] as *amicus curiae*, urges this Court to declare that the tort of insurer bad faith, in the context of first-party claims, can be established by evidence that the insurer

engaged in unfair, reckless, or oppressive tactics, or that it failed to engage in good faith settlement with its insured, notwithstanding that the claim may be fairly debatable. Thus, the parties suggest, an insurer may have a right to debate a fairly debatable claim; however, it must do so ethically and honestly, after a full and complete investigation conducted in accordance with the insurer's implied in law duties of good faith and fair dealing. In cases in which an insurer, confronted with a fairly debatable claim, has nonetheless undertaken the debate in a reckless and unfair manner, we are urged to hold that the insurer may be liable for bad faith. Finally, Skaling alleges the hearing justice erred in denying his motion to amend his complaint.

## Summary Judgment

■ This Court reviews the grant of summary judgment on a *de novo* basis by applying the same criteria as the motion justice. *Rhode Island Insurer's Insolvency Fund v. Leviton Manufacturing Co.*, 763 A.2d 590, 594 (R.I.2000). If, after a review of the admissible evidence, we conclude that no genuine issues of material fact are present and we are satisfied that the moving party is entitled to judgment as a matter of law, the summary judgment shall be affirmed. *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1225 (R.I.1996).

In the case at bar, the hearing justice appropriately recited the standard of proof required to withstand summary judgment for a claim of bad faith and concluded that plaintiff must establish the "absence of a reasonable basis" for the insurer's denial of benefits, and defendant's "knowledge or reckless disregard of the lack of a reason-

---

**3.** The Court gratefully acknowledges the *amicus curiae* brief of the Rhode Island Trial

Lawyers Association.

able basis for denying the claim." *Bibeault v. Hanover Insurance Co.,* 417 A.2d 313, 319 (R.I.1980) (quoting *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 376–77 (1978)). In *Bartlett,* 538 A.2d at 1001, we referred to the heavy burden placed upon a litigant attempting to establish insurer bad faith and held that plaintiff must demonstrate entitlement to a directed verdict on the contract claim, that is, a right to recover for breach-of-contract, as a matter of law.

We are now confronted with the question of whether, in the context of first-party claims, an insurer is insulated from a claim of bad faith simply because plaintiff was unable to obtain a judgment as a matter of law in the underlying breach-of-contract action. This issue is particularly compelling in cases in which the issue rests upon a disputed fact or the claim is denied based upon a disputed oral conversation between the insured and the claims examiner. These factual disputes cannot be determined as a matter of law. If the claims examiner's testimony is untruthful and rejected by the jury, plaintiff has established a breach of the insurance contract; however, because the issue was resolved by a finder of fact and not the trial justice at the close of evidence, the insurer is insulated from bad faith, notwithstanding its reckless conduct and oppressive tactics. We are of the opinion that the directed verdict standard of proof in this context is unworkable and unjust a situation that has been recognized in other jurisdictions.

Moreover, we are not convinced that the directed verdict standard comports with the requirements of § 9–1–33 that the issue of insurer bad faith is an issue of fact to be submitted to the jury. We note that the hearing justice in this case expressed his concern with the difficulty encountered in reconciling the "fairly debatable claim" standard that insulates an insurer from bad faith with the provision in § 9–1–33, which requires that this issue of bad faith "shall be a question to be determined by the trier of fact." The hearing justice concluded that he was left with no option "but to follow the 'fairly debatable' and reasonable basis test as it has been articulated" by the Supreme Court; but urged Skaling, however, to "ask the Supreme Court, as I would, what is the real meaning of § 9–1–33 in view of [the Court's] prior articulated, fairly debatable language in the cases [I] have cited?" Skaling has done so. Accordingly, we are asked to determine whether proof amounting to a directed verdict/judgment as a matter of law on the breach-of-contract claim is mandatory in all bad faith actions and further, whether the tort of bad faith is available in situations in which the claim was fairly debatable but was handled by the insurance company in an unfair, reckless or oppressive manner.

### Insurer Bad faith

■ In *Bibeault,* an advisory opinion given to the United States District Court, this Court joined a growing number of jurisdictions and recognized the common law tort of insurer bad faith in the context of the wrongful refusal to pay an uninsured or underinsured (UM–UIM) claim. *Bibeault,* 417 A.2d at 319. In recognition of the imbalance in the bargaining positions of the parties to an insurance contract, we concluded that limiting an insured to recovery of the policy limits for a breach of the insurance contract, without the threat of punitive damages or awards in excess of the policy limits, would do little to promote the prompt payment of claims or to prevent an unscrupulous insurer from refusing payment or delaying settlement of legitimate claims in hopes of either avoiding payment completely or reaching a settlement for an amount sub-

stantially lower than the claim's true worth. *Id.* at 318. We declared that insurers doing business in Rhode Island are "obligated to act in good faith in [their] relationship with [their] policyholders," and that a "violation of this duty will give rise to an independent claim in tort." *Id.* at 319. "[Where] there has been a specific finding that the insurer has in bad faith refused to pay the claims due an insured" the insurer is liable for both compensatory and punitive damages. *Id.* However, we specifically held that not every refusal-to-pay situation amounts to bad faith, nor did we mean to "imply that whenever an insurance company loses a dispute in court regarding the validity of a claim, it breaches the implied-in-law duty of good faith." *Id.* We determined that in cases in which "a claim is 'fairly debatable,' no liability in tort will arise." *Id.* That is, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.* (quoting *Anderson,* 271 N.W.2d at 376–77). However, an insurer's actual knowledge that there is no reasonable basis for denying a claim may be inferred and imputed to the insurer through the acts of its agents that demonstrate "a reckless indifference to facts or to proofs submitted by the insured." *Id.*

Subsequent to our holding in *Bibeault,* the General Assembly enacted § 9–1–33,[4]

that not only codified this cause of action but also provided that "the question of whether or not an insurer has acted in bad faith in refusing to settle a claim shall be a question to be determined by the trier of fact." In *Bartlett,* we parted company with other jurisdictions and held that the bad faith claim must be severed from the breach-of-contract claim and that no action in bad faith can lie unless and until an insured has proven a breach of the insurance contract. *Bartlett,* 538 A.2d at 1000. Consequently, the insurer is not required to produce its claim file until the breach-of-contract claim has been resolved, "[o]therwise, privileged material may be disclosed which would jeopardize the insurance company's defense." *Id.* at 1001 (quoting *In re Bergeson,* 112 F.R.D. 692, 697 (D.Mont.1986)). Although *dicta,* we further expounded upon the "heavy burden" placed upon a plaintiff attempting to prove insurer bad faith and held that in order for a plaintiff to "make out a *prima facie* case of bad faith refusal to pay an insurance claim, the proof offered must show that plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law." *Id.* at 1002. (quoting *National Savings Life Insurance Co. v. Dutton,* 419 So.2d 1357, 1362 (Ala.1982)). This breach-of-contract directed verdict standard has been applied in subsequent decisions of this Court relative to insurer bad faith. *Rumford Property and Liabili-*

4. General Laws 1956 § 9–1–33, provides in pertinent part:

"**Insurer's bad faith refusal to pay a claim made under any insurance policy.**—(a) Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing the policy when it is alleged the insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of the policy, or otherwise wrongful-

ly and in bad faith refused to timely perform its obligations under the contract of insurance. In any action brought pursuant to this section, an insured may also make claim for compensatory damages, punitive damages, and reasonable attorney fees. In all cases in which there has been no trial in the superior court on or before May 20, 1981, the question of whether or not an insurer has acted in bad faith in refusing to settle a claim shall be a question to be determined by the trier of fact."

*ty Insurance Co. v. Carbone*, 590 A.2d 398, 400 (R.I.1991) ("as part of a plaintiff's *prima facie* case, he or she must offer proof sufficient to entitle him or her to a directed verdict on the contract claim"); *Corrente v. Fitchburg Mutual Fire Insurance Co.*, 557 A.2d 859, 861–62 (R.I.1989) (proof offered in a bad faith claim must show that plaintiff is entitled to a directed verdict for breach of the insurance contract). It makes little sense that an insurance company may deny a claim, assert a coverage issue in a reckless and oppressive fashion, fail to timely respond to its obligations, or otherwise behave in a manner inconsistent with its implied duties of fair dealing and be insulated from tort liability for its bad faith conduct because it fortuitously survives a motion for judgment as a matter of law, yet is ultimately found to have breached the insurance contract. Such a holding conflicts with the public policy of this state that imposes implied-in-law obligations of good faith and fair dealing upon insurers doing business in Rhode Island.

In recent years, this Court has had occasion to address the refusal or negligent failure of an insurance company to make a timely offer of settlement in the context of both third-party claims, in which the insurer is obligated to defend its insured against liability to third-parties, *Asermely v. Allstate Insurance Co.*, 728 A.2d 461 (R.I.1999),[5] and in first-party claims, where the insured has made a claim against its own carrier for compensation arising out of injuries received from a UM–UIM driver. *Skaling v. Aetna Insurance Co.*, 742 A.2d 282 (R.I.1999).

Recently, this Court has held that insurers owe their insureds a fiduciary obligation with respect to protecting the insured from excess liability in the context of third-party claims. *Fraioli v. Metropolitan Property and Casualty Insurance Co.*, 748 A.2d 273, 275 (R.I.2000); *Asermely*, 728 A.2d at 464. Thus, an insurer has a fiduciary obligation "to act in the 'best interests of its insured in order to protect the insured from excess liability' " and to refrain from conduct that demonstrates " 'greater concern for the insurer's monetary interest than the financial risk attendant to the insured's situation.' " *Asermely*, 728 A.2d at 464 (quoting *Medical Malpractice Joint Underwriting Association of Rhode Island v. Rhode Island Insurers' Insolvency Fund*, 703 A.2d 1097, 1102 (R.I. 1997)). We have made it abundantly clear that the duty of good faith and fair dealing includes an affirmative duty to engage in timely and meaningful settlement negotiations and to make and consider offers of settlement consistent with an insurer's fiduciary duty to protect its insured from excess liability. In *Asermely*, although we concluded that Allstate did not act in bad faith given the extent of the comparative negligence by the plaintiff, (see note 5 *ante* ), we held that Allstate must bear the risks attendant to its failure to settle a claim within the policy limits. *Asermely*, 728 A.2d at 464. The rule we announced in *Asermely* provides that an insurer is liable for a judgment that exceeds the policy limits unless the insurer can demonstrate that it made a definite pretrial offer

---

**5.** We note that an arbitrator found the plaintiff to be 25 percent contributorily negligent and a jury subsequently found 60 percent comparative negligence on plaintiff's part. Although we held these findings established a fairly debatable claim, contrary to Aetna's assertion herein, we did not conclude that every instance of comparative negligence on the part of the insured gives rise to a fairly debat-

able claim as a matter of law. *Asermely v. Allstate Insurance Co.*, 728 A.2d 461, 462, 464 (R.I.1999). This is particularly noteworthy in this case because in *Skaling I*, we determined that the trial justice erred in refusing to instruct the jury on the rescue doctrine, a device that completely removes the issue of comparative negligence from the jury's determination.

to settle the claim within the policy limits and that the claimant declined the offer. *Id.* Thus, the risk of miscalculating the merits of a claim and proceeding to trial falls upon the insurer, the entity that controls the litigation and with whom the insured has contracted. *Id.* In *Skaling I,* we distinguished *Factory Mutual Liability Insurance Co. of America v. Cooper,* 106 R.I. 632, 262 A.2d 370 (1970), and *Allstate Insurance Co. v. Pogorilich,* 605 A.2d 1318 (R.I.1992), and held that prejudgment interest is recoverable against a UM–UIM insurer in a first-party breach-of-contract claim even where it exceeds the policy limits. *Skaling I,* 742 A.2d at 291–93. Our holding in *Skaling I* was based on the fact that the defendant insurer breached its contract with its insured thereby forcing the insured to resort to expensive litigation to enforce his rights under the contract. *See id.* at 292. "[C]onsequently, the damage award as embodied in the judgment is squarely within the plain language of § 9–21–10," that provides for the imposition of prejudgment interest on civil judgments for pecuniary damages. *Skaling I,* 742 A.2d at 292. Further, in *Bolton v. Quincy Mutual Fire Insurance Co.,* 730 A.2d 1079, 1080–81 (R.I.1999), we were confronted with the question of whether an insurer's unexplained refusal to respond to a request by its insured to settle with the underinsured tortfeasor constituted bad faith as a matter of law, and held that the denial of a request by an insured to settle with the tortfeasor must be based on objective and reasonable criteria that is discoverable by the insured in a subsequent bad faith claim. *Also see Bibeault,* 417 A.2d at 319. In situations in which an insurer refuses permission to settle with the UM–UIM tortfeasor or fails to settle with its own insured, it exposes itself to a claim for bad faith if it acts in the absence of realistic and objectively measurable criteria that supports its decision to deny the

claim for UM–UIM benefits or refuse to settle with its insured.

## Standard of Proof for a Fairly Debatable Claim

On appeal, this Court is called upon to determine whether every claim of insurer bad faith must be established by proof of a breach of the contract of insurance sufficient to warrant a directed verdict or judgment as a matter of law (JML), or whether there are certain instances of insurer misconduct that can be submitted to the jury even if an insured is not entitled to JML on the contract claim. After carefully reviewing the case law from other jurisdictions, including states we looked to in deciding *Bibeault* and *Bartlett,* we are satisfied that certain claims of insurer bad faith are sustainable, notwithstanding the failure of plaintiff to establish entitlement to JML on the contract claim. Further, in situations in which the claim is fairly debatable, we are asked to determine whether liability may be imposed in situations in which the carrier intentionally or recklessly failed to properly investigate a claim, or failed to subject its investigation to an appropriate cognitive evaluation and review, or otherwise acted in an oppressive and unreasonable manner. We answer this question in the affirmative.

Since the intentional tort of bad faith was first recognized in *Fletcher v. Western National Life Insurance Co.,* 10 Cal. App.3d 376, 89 Cal.Rptr. 78 (1970), in which a California Court of Appeals declared that an insurer's bad faith withholding of payments due under an insurance policy was a breach of the implied-in-law duty of good faith and fair dealing owed to its insured, numerous jurisdictions have defined and redefined the nature of the tort and the level of proof needed to establish the claim. In recognition that mere negligence in failing to settle a claim

against an insured may subject the carrier to payment in excess of the policy limits, but is not an actionable tort, courts typically have required a heightened standard of proof. In *Bibeault,* this Court held that "[i]f a claim is 'fairly debatable,' no liability in tort will arise." *Bibeault,* 417 A.2d at 319. We adopted the test set forth by the Supreme Court of Wisconsin that "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim," and that these elements may be inferred from evidence of a reckless disregard for the truth or "a reckless indifference to facts or to proofs submitted by the insured." *Id.* (quoting *Anderson,* 271 N.W.2d at 376–77). This definition was expanded in *Bartlett,* to include the requirement that

"the plaintiff in a 'bad faith refusal' case has the burden of proving:
"(a) an insurance contract between the parties and a breach thereof by the defendant; * * *
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(d) the insurer's actual knowledge or the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."
*Bartlett,* 538 A.2d at 1000 (quoting *Dutton,* 419 So.2d at 1361).

As noted, in *Bartlett,* we adopted the directed verdict standard of proof, as approved by the Alabama Supreme Court in *Dutton,* 419 So.2d at 1362. *Bartlett,* 538

A.2d at 1002. This heightened standard of proof has become the *sine qua non* of a fairly debatable claim, and the terms "fairly debatable" and "directed verdict on the contract claim" are employed interchangeably. Notably, the Alabama Supreme Court has recognized the unfortunate circumstance that recovery for the tort of an insurer's bad faith failure to pay a claim, "once thought to be a rarely applicable remedy, ·* * * appears now with great frequency." *Employees' Benefit Association v. Grissett,* 732 So.2d 968, 978 (Ala. 1998). Since its holding in *Dutton,* Alabama has responded accordingly.

In response to the burgeoning number and types of insurer misconduct cases, the Alabama Supreme Court has adopted numerous exceptions to the directed verdict standard, such that a commentator has concluded that the exceptions have swallowed the rule. *See* Stephen D. Heninger & Nicholas W. Woodfield, *A Practitioner's Guide to Alabama's Tort of Bad faith,* 57 Ala. Law. 277, 281 (1996). The most important difference between Alabama's procedures and the presentation of bad faith claims in Rhode Island is that, unlike Rhode Island, the claims are not severed— the breach-of-contract claim and the bad faith claim are presented to the same jury at the same time. Hence, the directed verdict standard is more easily (although not universally) applied in the context of the same proceeding. "[K]eenly aware of the fact that there were countervailing policy considerations that weighed in favor of an insured's right to have his claim properly evaluated and promptly paid by the insurer," the Alabama courts have restricted the directed verdict on the contract claim standard to " 'normal' " or " 'ordinary' " bad faith cases and articulated "a different standard to be applied in certain unusual or extraordinary cases." *Nation-*

al Insurance Association v. Sockwell, March 15, 2002 at 41.

In *Safeco Insurance Co. of America v. Sims*, 435 So.2d 1219 (Ala.1983), the court held that the directed verdict on the contract claim test "is not to be read as requiring, in every case and under all circumstances, that the tort claim be barred unless the trial court has literally granted plaintiff's motion for a directed verdict on the contract." *Id.* at 1224. Rather, the court described that test as an objective standard by which to measure the burden of proving "that [the] defendant's denial of payment was without any reasonable basis either in fact or law;" that is, proof that the insurer's defense to the contract claim "is devoid of any triable issue of fact or reasonably arguable question of law." *Id.* at 1224–25. Thus, the directed verdict standard was held not to apply in cases in which the insurer "intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review." *Thomas v. Principal Financial Group*, 566 So.2d 735, 744 (Ala.1990).

Moreover, when the question of insurer bad faith hinges on a disputed issue of fact, *Safeco*, 435 So.2d at 1224, or a disputed oral conversation between the insurer and its insured, *Jones v. Alabama Farm Bureau Mutual Casualty Co.*, 507 So.2d 396, 400–01 (Ala.1986), merely because the insurer withstands a directed verdict motion because an issue of fact exists, the plaintiff is not barred, as a matter of law, from pursuing the tort claim. "Although the plaintiff's burden of proof in a bad faith action is great, it should not be insurmountable." *Id.* at 401. Further, when the allegedly disputed factual issues arise solely from the statements of the insurer, the directed verdict standard is not applicable; such a rule would frustrate the purpose of the bad faith action by allowing

an insurer to avoid a bad faith claim by feigning ignorance of the claim or misrepresenting the content of oral or written communications. *Id.*

As discussed, another well-recognized exception to the fairly debatable/directed verdict on the contract claim standard centers on the intentional or reckless failure on the part of an insurer to properly investigate the claim to determine the existence of a valid reason for denying payment, or the failure to submit the results of the investigation to a cognitive evaluation and review to determine whether there was a lawful basis for denying the claim. *Thomas*, 566 So.2d at 744 (citing *Continental Assurance Co. v. Kountz*, 461 So.2d 802 (Ala.1984)).

Significantly, in *Grissett*, 732 So.2d at 976, the court held that the insurer in a "normal" case "cannot use ambiguity in the contract as a basis for claiming a debatable reason not to pay the claim." "Otherwise, an insurer would have the incentive to write ambiguous policies in order to create an absolute defense to a bad faith claim." *Id.* at 976–77. Finally, in *Loyal American Life Insurance Co. v. Mattiace*, 679 So.2d 229 (Ala.1996), the court determined that the question of bad faith is to be tested at the time of the denial. Recognizing that an insurer has a responsibility to marshal all the facts necessary for a fair and comprehensive investigation *before* it refuses to pay a claim, the court limited the insurer's attempts to establish a fairly debatable claim to the proof in its possession at the time the claim was denied. "[T]he insurance company cannot later seek to justify its denial [of an insured's claim] by gathering information which it should have had in the first place." *Aetna Life Insurance Co. v. Lavoie*, 505 So.2d 1050, 1053 (Ala.1987).

In addition to these judicial variants to the fairly debatable/directed verdict on the

contract claim standard for establishing insurer bad faith, several jurisdictions have developed alternative approaches to first-party bad faith claims and have rejected the fairly debatable/directed verdict on the contract claim standard in its entirety.

The Arizona Supreme Court has determined that the insurer's belief in the fair debatability of a claim is a question of fact for the jury. In *Zilisch v. State Farm Mutual Automobile Insurance Co.*, 196 Ariz. 234, 995 P.2d 276 (2000), the Arizona Supreme Court rejected the contention that an insurer's wrongful conduct is irrelevant in situations in which the claim is fairly debatable. "While it is clear that an insurer may defend a fairly debatable claim, all that means is that it may not defend one that is not fairly debatable. But in defending a fairly debatable claim, an insurer must exercise reasonable care and good faith." *Id.* at 279. The Arizona Court recognized that an insurance contract provides more than security from financial loss—"'the insured also is entitled to receive the additional security of knowing that [he or] she will be dealt with fairly and in good faith.'" *Id.* at 280. Thus, in Arizona, the fact that the insurer has eventually performed the contract and paid the claim short of litigation, does not insulate it from bad faith tort liability.

> "The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy. It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy. It cannot lowball claims or delay claims hoping that the insured will settle for less. Equal consideration of the insured requires more than that." *Id.*

Nor is a plaintiff required to establish that he or she is entitled to a JML on the breach-of-contract claim. "The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably" and whether there is proof that the insurer "either knew or was conscious of the fact that its conduct was unreasonable." *Id.*

The Supreme Court of Kentucky rejected the fairly debatable claim standard and held that the existence of jury issues on the contract claim does not defeat the bad faith claim, notwithstanding the right of the insurer to challenge a fairly debatable claim. "Although matters involving investigation and payment of a claim may be 'fairly debatable,' an insurer is not thereby relieved from its duty to comply with the mandates of [Kentucky law]." *Farmland Mutual Insurance Co. v. Johnson*, 36 S.W.3d 368, 375 (Ky.2000). An insurance company is obligated "to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner" and, although "elements of a claim may be 'fairly debatable,' an insurer must debate the matter fairly." *Id.* Further, following the lead of Arizona in *Zilisch*, the court held that "whether a claim or the amount * * * is fairly debatable is a question of fact for the jury and * * * the fact of a disputed amount does not relieve the insurer of its duty to handle the claim fairly."

> "The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Id.* (quoting *Zilisch*, 995 P.2d at 280).

The State of Florida has also rejected the fairly debatable standard for determining the existence of insurer bad faith. Recognizing that the tort of bad faith refusal to pay a first-party claim, as opposed to a third-party claim, is purely a statutory remedy, the Supreme Court of Florida found the fairly debatable standard to be inappropriate and rejected it in its entirety. *State Farm Mutual Automobile Insurance Co. v. Laforet*, 658 So.2d 55, 62 (Fla.1995). The court adopted a totality of the circumstances approach in evaluating both third-party and first-party bad faith claims. *Id.* at 63. Further, the court set forth several factors that should be taken into account in evaluating first-party bad faith actions, including: (1) the "efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insureds;" (2) the "substance of the coverage dispute or the weight of legal authority on the coverage issue;" and (3) the "insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage." [6] *Id.* Finally, the court concluded that the issue of bad faith is a question of fact for the jury. *See John J. Jerue Truck Broker, Inc. v. Insurance Company of North America*, 646 So.2d 780 (Fla.Dist.Ct.App.1994) (disputed issues of material fact relative to insurer bad faith are jury questions).

■■■ Although the approach adopted by these jurisdictions is of more than passing interest, we are not persuaded, at this time, to abandon the rule that an insurer has the right to debate a claim that is fairly debatable. However, we are of the

opinion that the directed verdict or JML on the contract claim is unworkable and we revisit our prior decisions in this regard. We decline to hold that a plaintiff, to litigate his or her bad faith claim, must establish entitlement to a JML on the breach-of-contract claim. Rather, we hold, consistent with § 9–1–33, that "the question of whether or not an insurer has acted in bad faith in refusing to settle a claim shall be a question to be determined by the trier of fact." That is, bad faith is established when the proof demonstrates that the insurer denied coverage or refused payment without a reasonable basis in fact or law for the denial. We deem this rule to be of particular significance in this jurisdiction because claims of insurer bad faith are severed and tried separately from the breach of insurance contract claim, a procedure that provides the insurer with significant procedural protections, including nondisclosure of its file until the completion of the breach-of-contract action.[7]

■■■ Insurers doing business in Rhode Island have an implied obligation to promptly and fully respond to their insured, to investigate a claim and to subject that claim to appropriate review. An insurer has a responsibility to assemble all the facts necessary for a fair and comprehensive investigation *before* it refuses to pay a claim and may not base a defense to bad faith on later acquired information. "[T]he insurance company cannot later seek to justify its denial [of an insured's claim] by gathering information which it should have had in the first place." *Lavoie*, 505 So.2d at 1053. Accordingly, in-

---

6. These factors were delineated by the Court of Appeals of Florida in *Robinson v. State Farm Fire & Casualty Co.*, 583 So.2d 1063 (Fla.Dist.Ct.App.1991), with respect to third-party claims that may be brought as common law claims or statutory causes of action.

7. Although the question of whether every claim of bad faith in every case should be severed from the breach-of-contract claim is not now before us, in an appropriate case, a bifurcated trial may be a useful alternative approach.

formation acquired by an insurer subsequent to the denial of the claim is neither relevant nor admissible evidence in the bad faith action. Moreover, the insurer is limited to introducing evidence that it actually relied upon and communicated to the insured when it denied the claim, and may not seek to enhance its defense by pointing to extraneous facts or arguments that it did not communicate to the insured when it refused payment. "[T]he decision of the insurance company to deny a claim under an insurance policy must be judged by what was before it at the time the decision was made." *Insurance Company of North America v. Citizensbank of Thomasville*, 491 So.2d 880, 883 (Ala.1986) (citing *Federated Guaranty Life Insurance Co. v. Wilkins*, 435 So.2d 10, 13 (Ala. 1983)). As noted herein, evidence that Skaling had consumed several alcoholic beverages before he attempted to rescue Webber was acquired by Aetna well after it denied Skaling's claim. Although this information played no part in Aetna's denial of the claim, it was heavily relied upon by Aetna in support of its motion for summary judgment. Skaling's use of alcohol did not factor into the decision to deny coverage and may not be relied upon now to defend against allegations of bad faith. We note that in granting summary judgment, the hearing justice specifically pointed to Skaling's use of alcohol in finding that the claim was fairly debatable. We deem this to be error and hold that this evidence may not be relied upon by Aetna in defense of a claim of bad faith.

 Although we decline to abandon the fairly debatable standard and recognize that an insurer is entitled to debate a claim that is fairly debatable, we are not persuaded that an insurer is relieved of its obligations to deal with its insured consistent with its implied in law obligations of good faith and fair dealing simply because the claim is fairly debatable. Accordingly, an intentional failure on the part of the insurer to determine whether there is a lawful basis to deny the claim, standing alone, is bad faith. This can be established by proof that the insurer "either intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review." *Thomas*, 566 So.2d at 744 (citing *Gulf Atlantic Life Insurance Co. v. Barnes*, 405 So.2d 916 (Ala.1981)). The insurer's failure to conduct an appropriate and timely investigation may subject the insurer to bad faith liability notwithstanding the merits of the claim. Although a fairly debatable claim "is a necessary condition to avoid liability [for] bad faith, it is not always a sufficient condition." *Zilisch*, 995 P.2d at 280. Rather, we are satisfied that "[t]he appropriate inquiry is whether there is sufficient evidence from which reasonable [minds] could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Id.*

 Moreover, although a claim may be fairly debatable and the insurer may elect to engage in a debate, consistent with its obligations of good faith and fair dealing, an insurer is nonetheless obliged to engage in settlement discussions in an effort to relieve the insured from the burden and expense of litigation. When, as here, the damages were substantial and the claimant was permanently injured, we are satisfied that, in light of the amount of the policy limits at issue, and the strength of the claim, the insurer was not relieved of its obligation to make *any* settlement offers, even if the claim was fairly debatable. One of the tests of insurer good faith is whether the insurer was reasonable in both its investigation of the claim and in its

settlement behavior. It is the policy of this state to encourage the settlement of controversies in lieu of litigation. *See Rhode Island Insurers' Insolvency Fund v. Benoit,* 723 A.2d 303, 308–309 (R.I.1999) (insurers are under an equivalent duty to participate in settlement negotiations for first-party claims and third-party claims).

This policy has further statutory support. General Laws 1956, chapter 9.1 of title 27, the "Unfair Claims Settlement Practices Act," mandates specific standards for the investigation and disposition of insurance claims.[8] Included in the definition of unfair claims practices are:

> "(4) Not attempting in good faith to effectuate prompt, fair, and equitable settlement of claims submitted in which liability has become reasonable [*sic*] clear;
>
> "(5) Compelling insureds, beneficiaries, or claimants to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them;
>
> "(6) Refusing to pay claims without conducting a reasonable investigation." Section 27–9.1–4.

■■■ We therefore are satisfied that in every case, an insurer must determine whether liability is reasonably clear by objective, measurable criteria, engage in settlement negotiations and attempt, in good faith, to resolve the claim so that its insured is relieved from the burden of instituting a suit to recover under the policy.

■■■ Finally, we reiterate that not every refusal to pay amounts to insurer bad faith. A plaintiff must demonstrate an absence of a reasonable basis in law or fact for denying the claim or an intentional or reckless failure to properly investigate the claim and subject the result to cognitive evaluation. However, the obligations imposed on insurers doing business in Rhode Island have never changed—"an insurance company has a 'fiduciary obligation to act in the "best interests of its insured," ' " and not its own pecuniary interest at all times. *Bolton,* 730 A.2d at 1081 (quoting *Asermely,* 728 A.2d at 464).

### Skaling's Claims

In the case at hand, Aetna initially denied the claim in June 1996, asserting that Skaling's fall did not arise out of the ownership, maintenance or use of Menard's Jeep as required by the policy, and that Skaling failed to prove that Menard was uninsured. The basis of the denial of the claim was Aetna's subjective belief that Skaling's injuries were not proximately related to the placement of the Menard vehicle on the trestle.[9] "Because Skaling was not able to describe exactly how he fell from the bridge, Aetna argued that the jury could not conclude that the fall was caused by the Jeep." *Skaling I,* 742 A.2d at 288. This argument was soundly rejected in *Skaling I,* in which we noted that causation is established by a showing that but for the placement of the Jeep on the

---

**8.** Although G.L.1956 § 27–9.1–1 provides that "[n]othing in this chapter shall be construed to create or imply a private cause of action for violation of this chapter," the tort of insurer bad faith is not a new or separately created cause of action. We deem this chapter to set forth the statutory obligations imposed upon an insurer with respect to the handling of claims and that evidence of any breach thereof may be admissible in a civil action alleging bad faith.

**9.** In its initial denial letter of June 14, 1996 and, after Skaling's attorney submitted additional information, in a second denial letter on August 6, 1996, the denial of the claim was based on Aetna's determination that "the policy does not provide coverage for this loss."

trestle, the injury would not have occurred. *Id.* Further, we held that a plaintiff "is not required to demonstrate with absolute certainty each precise step in the causal chain between the tortfeasor's breach of duty and the injury." *Id.* We concluded that there was "ample evidence to support the jury's conclusion that Menard's negligence in driving his Jeep onto the bridge caused Skaling's injuries." *Id.* Further, we observed that *"[r]egardless of its exact position,* the vehicle occupied almost the entire width of the bridge, and *anyone* who attempted to cross was forced to walk at the very edge of the bridge." *Id.* (Emphases added.) We therefore determined, as did the fact-finder, that "but for the negligent driving of the vehicle on the bridge, Skaling would not have been forced to walk at the edge of the bridge and would have avoided being injured." *Id.*

■ We recently have had occasion to interpret the meaning of language in an insurance policy that, in order to recover UM UIM, the injuries must arise out of "the ownership, maintenance or use" of the uninsured/underinsured vehicle and held that this provision does not mean " 'proximately caused by,' but [has] a broader meaning that simply required some nexus between the motor vehicle and the injury." *Liberty Mutual Insurance Co. v. Tavarez,* 754 A.2d 778, 780 (R.I.2000) (quoting *General Accident Insurance Company of America v. Olivier,* 574 A.2d 1240, 1242 (R.I.1990)). Indeed, we previously have held that it is unnecessary that the automobile be the instrumentality of the injury, nor would "the type of conduct that causes the injury of necessity be foreseeably identifiable with the normal use of the vehicle." *Id.* (quoting *Government Employees Insurance Co. v. Novak,* 453 So.2d 1116, 1119 (Fla.1984)). Thus, insurers have been on notice that the mandates of UM UIM contemplate broad coverage, that simply requires "some nexus" between the tortfeasor's vehicle and the injury. Thus, a jury ultimately may find that Aetna gave little or no consideration to the controlling law relative to the minimal evidentiary nexus required to establish liability under the UM UIM provisions of Skaling's policy.

■ The record discloses that Aetna claims representative, Martha L. Quaratella (Quaratella), conducted the initial investigation into Skaling's injuries and, although she recognized that Skaling's damages "could be worth in the upwards of the limits of [$300,000]," she ultimately recommended that the claim be denied. According to the record, Quaratella inspected the site, took numerous photographs and measured the width of the trestle bridge. However, she failed to ascertain the width of the Jeep. The trestle measured 86 inches, and the evidence adduced at trial set the width of the Jeep at 68.6 inches, thus allowing Skaling no more than 20 inches—approximately 10 inches on each side of the Jeep—to traverse the bridge. At a deposition, Quaratella testified that the primary reason for Aetna's denial of the claim was that Skaling had not sufficiently related his fall to the Menard vehicle, and that, "he never gave any indication whatsoever to me that the Jeep had anything to do with him falling." However, Skaling maintained that he informed Quaratella that he was "just trying to get by the Jeep [on the trestle] when the fall occurred." Quaratella testified that she believed Skaling had passed by the Jeep when he fell; but that "[i]t would have been a different scenario" if Skaling had been trying to get by the Jeep when the fall occurred. However, in her handwritten notes affixed to the numerous photographs she submitted, Quaratella noted that Skaling "was squeezing by the Me-

nard Jeep with his stomach up against it and apparently misstepped [*sic* ]." Clearly, a factual dispute existed concerning Quaratella's credibility and the statements she attributed to Skaling. Additionally, Skaling refused to sign a statement prepared by Quaratella in which she suggested that Skaling informed her that he did not know how he fell. Skaling denied ever saying this to Quaratella. This is precisely the type of disputed oral conversation that defies application of the directed verdict/JML on the contract-claim standard as a measure of the existence of insurer bad faith, and is rightfully a question for the fact-finder. The mere existence of this factual dispute should not defeat a claim for insurer bad faith.

■ Further, during the trial on the breach-of-contract claim, Skaling successfully asserted facts and arguments in support of coverage under the policy. The record demonstrates that Aetna was aware of these arguments, yet failed to appropriately investigate these circumstances, or to subject the results to appropriate evaluation and review. In a report to the defendant, Quaratella, obviously aware of the extent of plaintiff's injuries, suggested that Skaling's claim potentially could be worth the policy limits but "there are many other issues that the [attorney] must first prove." "[However, Aetna] may want to put up 10%—that looks to be about the shot the [attorney] has at this point of convincing us this policy should be responsive." The record discloses that Quaratella was aware that the tortfeasor had entered a plea of *nolo contendere* to a charge of operating his vehicle on the trestle, a violation of Department of Environmental Management regulations. The evidence demonstrated that Aetna was aware that Progressive Insurance, Menard's carrier, had offered to settle and did in fact settle with Skaling for the policy limits.[10] Also, according to Aetna's notes, Progressive settled with Skaling after it determined that Menard had parked his vehicle on the trestle, thereby creating the dangerous condition that gave rise to the rescue doctrine. In *Skaling I*, we held that the rescue doctrine [11] was relevant on the issue of Menard's liability and concluded that "Skaling was engaged in a non-reckless attempt to rescue Webber." *Skaling I*, 742 A.2d at 290. There is no suggestion that Aetna ever addressed the application of the rescue doctrine to the facts of this case. Thus, the question of Skaling's comparative negligence was in serious doubt; yet there is no evidence that Aetna adequately addressed the rescue doctrine or submitted the question to appropriate review.

■ We note that in granting Aetna's motion for summary judgment, the hearing justice referred to Skaling's use of alcohol at the time he attempted to rescue Webber. Aetna had no knowledge of these facts at the time it denied the claim and may not now raise the issue of comparative negligence as a defense in the bad faith action. Although the question of comparative negligence by Skaling is doubtful, we hold that comparative negli-

---

10. It was disclosed at oral argument that Aetna may have initially refused permission for Skaling to settle with Progressive for the limits of Menard's policy. Certainly, if Aetna denied permission to settle without good cause, then this conduct constitutes bad faith as a matter of law. *Bolton v. Quincy Mutual Fire Insurance Co.*, 730 A.2d 1079, 1080–81 (R.I.1999).

11. The rescue doctrine provides that one who attempts to rescue "a person in imminent danger caused by the negligence of another cannot be charged with contributory negligence" as long as the rescue attempt is not reckless. *Ouellette v. Carde*, 612 A.2d 687, 689 (R.I.1992).

gence by the insured does not conclusively defeat a claim for bad faith, rather it is a factor that may give rise to a reasonable basis to deny benefits. The issue of comparative negligence, like a fairly debatable claim, must be considered in light of all of the facts and circumstances available to the insurer at the time it denied coverage under the policy.

Moreover, the verdict in the breach-of-contract action was in excess of $1.3 million and the limit of Skaling's policy was $300,000. Thus, Skaling's comparative negligence could have been as high as 75 percent and he would have nonetheless been entitled to recover the policy limits. However, Aetna never offered to settle this claim in *any* amount, nor did Aetna engage in any settlement negotiations, and, notwithstanding the amount of his medical expenses or the extent of Skaling's injuries, Aetna refused Skaling's entreaty to arbitrate the dispute. Indeed, the claim file discloses that Geri Warton (Warton), a second claims examiner, prepared a memorandum on August 6, 1996, in which she stated that she discussed this case with an attorney and that "there is no proximate cause of [*sic*] the jeep being illegally parked and the claimant falling off the bridge." With respect to the offer to arbitrate, Warton noted that the Aetna policy did not include a provision for arbitration of claims over $25,000, "so insured's attorney must sue the [*sic*] Aetna." "[T]ell attorney we will not pay anything on this claim."

On the basis of this evidence, a jury could find that Aetna breached its implied obligations of good faith and fair dealing and is guilty of bad faith. First, there is a dearth of evidence suggesting that Aetna conducted a reasonable and adequate investigation. It failed to determine the width of the vehicle and failed to consider the fact that Quaratella's recollection of her oral conversation with Skaling might have been incorrect, particularly in light of her handwritten notes on the photographs. The facts appear to suggest that Aetna based its denial on its own narrow and subjective reading of the policy provisions without resort to the caselaw in this jurisdiction relative to the meaning of policy terms relating to the ownership, maintenance and use of the uninsured vehicle. Moreover, there is no evidence that Aetna submitted its investigation to an evaluation or sought cognitive review, nor is there a satisfactory resolution respecting the rescue doctrine relative to Aetna's reliance on Skaling's purported negligent use of alcohol. Therefore, we are satisfied that summary judgment was not appropriate and that the allegations in this case warrant a trial.

### Skaling's Motion to Amend the Complaint

Aetna correctly notes that almost four years after he filed his original complaint alleging bad faith and, approximately one month after Aetna moved for summary judgment, Skaling sought leave to amend his complaint to add two additional counts, neither of which set forth a cause of action or theory of recovery different from the bad faith count that already was pending. We are satisfied that the trial justice did not err nor did he abuse his discretion in denying the motion to amend Skaling's complaint.

The proposed additional count 5, alleged that Aetna failed to fulfill its "implied covenant of good faith and fair dealing." Clearly, this is merely a recitation of an element of bad faith, initially articulated in *Bibeault*, that was subsequently codified in § 9–1–33 and is not a separate and distinct claim. Skaling did not state a claim for relief different from

that which was previously pled in his original complaint.

 The proposed count 6, alleging a "willful and wanton breach-of-contract" without reasonable cause is, again, merely another ground available to a plaintiff to establish bad faith on the part of an insurance carrier. Because punitive damages are available as a matter of right in bad faith cases, it is unnecessary to plead or prove willful or wanton conduct. When an insurance company intentionally has failed to investigate the claim sufficiently, or to subject the investigation to cognitive evaluation and review, the insurer has acted in bad faith and has opened itself up to a compensatory damage award, punitive damages and attorney's fees. We therefore are satisfied that the trial justice acted within his discretion in denying Skaling's motion to amend his complaint.

### Conclusion

For the reasons set forth herein, the appeal is sustained in part and denied in part. We vacate the summary judgment entered against the plaintiff in this case. We deny and dismiss the plaintiff's appeal from the denial of his motion to amend the complaint. This case is remanded to the Superior Court for proceedings in accordance with this opinion.

Chief Justice WILLIAMS did not participate.